# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRIJ SHARMA, ROBERT CARLIN, and | : | |
| TILAK SHARMA, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civ. No. 15-419-LPS |
| | : | |
| TRIZETTO CORPORATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

Michael P. Kelly, David A. White, and Daniel J. Brown, McCARTER & ENGLISH LLP, Wilmington, DE,

      Attorneys for Plaintiffs.

Jamie L. Edmonson and Daniel O'Brien, VENABLE LLP, Wilmington, DE,

Edward Boyle and Xochitl Strohbehn, VENABLE LLP, New York, NY,

      Attorneys for Defendant.

## MEMORANDUM OPINION

March 29, 2016
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I.  BACKGROUND

### A.  Procedural Background

On May 26, 2015, Brij Sharma, Robert Carlin, and Tilak Sharma ("Plaintiffs") filed suit against TriZetto Corporation ("TriZetto" or "Defendant").  (D.I. 1)[1]  On July 16, TriZetto filed the Motion to Dismiss now pending before the Court.  The Court heard oral argument on January 26, 2016.  (*See* D.I. 21 ("Tr."))

### B.  Factual Background[2]

In August 2010 and March 2011, TriZetto purchased from Plaintiffs shares of Tela Sourcing, Inc. ("Tela"), a company that performed business outsourcing services for the healthcare industry.  (D.I. 1 at ¶ 14)  The acquisition was governed by a Share Purchase Agreement ("SPA").  Pursuant to the SPA, TriZetto paid Plaintiffs $13.5 million in cash.  (D.I. 12 at 9; *see* D.I. 14-1 at 10-11)  The SPA also included an "earn out" provision under which TriZetto agreed to pay Plaintiffs additional consideration if TriZetto's business processing outsourcing services ("BPO Business") achieved gross revenues of more than $47.2 million in the calendar year ending December 31, 2013.  (D.I. 1 at ¶ 22)

---

[1]The Complaint initially listed TZ Holdings L.P. as a defendant, but Plaintiffs have voluntarily dismissed TZ holdings.  (*See* D.I. 1, 13)

[2]This background is taken from the well-pleaded factual allegations in the Complaint, as it must be at this stage of the proceedings.  The Court has also considered Defendant's Declaration (D.I. 14), which includes copies of the SPA and correspondence between the parties related to this matter.  Plaintiffs agree that the Court may properly consider these materials in resolving Defendants' motion.  (*See* Tr. at 26-27)

Both "Gross Revenue" and "BPO Business" are defined terms in the SPA.  Gross Revenue is defined as "all consolidated revenues and income of the BPO Business as determined in accordance with GAAP." (D.I. 14-1 at 54)  BPO Business is defined as "the business process outsourcing services business of [TriZetto] that provides credentialing, front-end processing, eligibility and enrollment processing, premium billing, and claims administration services to health plans and third party administrators." (*Id*. at 51)

The parties anticipated the possibility that TriZetto might engage in subsequent transactions – such as acquisitions, investments, and joint ventures – which might contribute to the revenues of the BPO business.  The SPA provides that the parties must "negotiate in good faith" to determine whether any revenue or income derived from such post-closing activities involving TriZetto should be considered Gross Revenue under the SPA.  (*Id*. at 54)  As a default, the SPA states that "until such time as the parties reach a mutual agreement, such derived revenue and income shall not be deemed revenue or income of the BPO Business for the purposes of determining Gross Revenues." (*Id*.)

In February 2014, TriZetto sent Plaintiffs an Earn-Out Calculation Statement indicating that the BPO Business's 2013 Gross Revenue fell short of the $47.2 million threshold necessary to trigger Plaintiffs' earn-out payment. (D.I. 14-2 at 2)  In March 2014, Plaintiffs responded with an Earn-out Calculation Objection Notice, stating that TriZetto's earn-out calculations were deficient because (1) the Earn-Out Calculation Statement failed to provide reasonable details regarding TriZetto's earn-out calculation, (2) TriZetto failed to include the Gross Revenue of several post-closing acquisitions in its calculation, and (3) TriZetto failed to operate the BPO business in good faith. (D.I. 14-3 at 3-4)

A month later, TriZetto responded to Plaintiffs' objection.  First, TriZetto forwarded a spreadsheet containing the financial information that served as a basis for its earn-out calculation. (*See* D.I. 14-4 at 2-7)  Second, TriZetto disclosed the names of companies it had acquired after entering into the SPA, stated that only one of those companies – HPA – operates in the BPO market sector, and explained that HPA's revenue had already been included the earn-out calculation.  (*Id.* at 2)  Third, TriZetto stated that it had operated the business in good faith.  (*Id.* at 3)  Finally, TriZetto noted that, while it believed its "good faith determination of the Earn-out Payment would withstand any inquiry," it was willing to "discuss this matter with [Plaintiffs] further to explain any remaining questions [Plaintiffs might] have regarding the calculation." (*Id.*)

Throughout the remainder of 2014, the parties discussed the possibility of hiring an accounting firm to settle their dispute regarding the earn-out calculation.  (D.I. 14-5 at 2-29) Plaintiffs argued that the accounting firm should determine whether revenue from TriZetto's post-closing acquisitions and investments should be considered revenue from "BPO Business." (*Id.* at 15)  Both TriZetto and the prospective accounting firm, Grant Thornton, responded that an accounting firm could not appropriately resolve the question of which acquisitions should be considered BPO Business, because the SPA required the parties to make that determination through good faith negotiation.  (*Id.* at 14-17)

In December 2014, TriZetto proposed "a path forward" to address Plaintiffs' questions and resolve which post-closing acquisitions constitute BPO business.  (*Id.* at 14)  TriZetto suggested that, if Plaintiffs had a "good faith basis to believe that any of the acquired companies operate within the BPO Business . . . [Plaintiffs] provide the name of the acquisition, along with

a brief description of the reason [Plaintiffs] believe the business operates in the BPO Business, as

defined in the [SPA]." (D.I. 14-5 at 14)  TriZetto promised that it would respond to such a letter

in a timely manner. (*Id.*)  In early January, 2015, Plaintiffs responded by sending a request for

information about "each acquisition company," including total revenue, product revenue, service

revenue, details about the services provided by each company "including invoicing details," and

"employee details per functions performed." (*Id.* at 18-21)  Plaintiffs identified by name only

one such company – Gateway EDI. (*Id.*)

TriZetto's response noted that Plaintiffs' detailed request for information went "well

beyond TriZetto's offer" to provide information. (D.I. 14-5 at 23-29)  TriZetto nevertheless

provided a detailed description of the services provided by the identified company, Gateway,

along with TriZetto's position as to why that business was not "BPO business." (*Id.* at 24-28)

TriZetto did not prepare detailed statements about any of its other acquisitions, nor did it provide

financial data regarding Gateway. (*Id.* at 23-29)

Thereafter, Plaintiffs filed this lawsuit.

## II.   LEGAL STANDARDS

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires

the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372

F.3d 218, 223 (3d Cir. 2004).  "The issue is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat

Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted).

Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded

allegations in the complaint as true, and viewing them in the light most favorable to plaintiff,

4

plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481–82 (3d Cir. 2000) (internal quotation marks omitted).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that "raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact)." *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiffs claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

## III.   DISCUSSION

Plaintiffs' Complaint asserts claims for: (1) breach of contract under Delaware law; (2) breach of the implied covenant of good faith and fair dealing under Delaware law; and (3) declaratory judgment pursuant to 28 U.S.C. § 2201. Defendants move to dismiss each claim.

### A.    Breach of Contract

To state a claim for breach of contract in Delaware, a Plaintiff must allege: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003). Plaintiffs allege that TriZetto has breached the SPA in at least five separate ways: by (1) operating the BPO business to avoid owing Plaintiffs the earn-out payments; (2) failing to include revenue of post-closing acquisitions in the earn-out payment calculation; (3) failing to engage in good-faith negotiations or provide reasonable details about the earn-out calculation; (4) failing to appoint or retain an accounting firm; and (5) failing to maintain and promote BPO business. A discussion of each alleged breach follows.

### 1.    Operating the BPO business to avoid  payments

The SPA required TriZetto to "operate the [BPO business] in good faith consistent with its fiduciary duties under applicable Law and . . . not, directly or indirectly, take any actions in bad faith that would have the purpose of avoiding or reducing the earn-out payment." (D.I. 14-1 at 9) Plaintiffs allege that TriZetto breached this duty by operating the BPO business "in a manner that avoids TriZetto's obligation to remit the Earn-Out Payments." (D.I. 1 at ¶ 42) Plaintiffs allege that TriZetto attempted to avoid by payments by: (1) failing to market the business; (2) changing management teams; and (3) failing to invest resources in operating the business. (D.I. 1 at ¶ 21) Plaintiffs allege that their expectations about these activities – in particular, the efforts TriZetto would take to market the business – were material to their decision to enter into the SPA. (*Id.*)

Even taking all of these allegations are true, these claims provide no basis for inferring that TriZetto acted in bad faith. In the SPA, Plaintiffs recognized that TriZetto had "sole discretion with regard to all matters relating to the operation of [the acquired business]." (D.I. 14-1 at 9) A party to a contract, such as TriZetto, does not act in bad faith by relying on contract provisions for which that party bargained, even where doing so limits benefits to another party. *See Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 638 (Del. Ch. 2011), *aff'd*, 76 A.3d 808 (Del. 2013). Plaintiffs have not alleged facts that suggest TriZetto made business decisions with the goal of avoiding the earn-out payment, or even shown that their acts are inconsistent with routine business practice. For all of these reasons, Plaintiffs have failed to state a claim for breach of contract based on these allegations.

### 2.   Failing to include revenue of post-closing acquisitions in the earn-out payment calculation

The SPA required TriZetto to include in its calculation of the earn-out payment the "Gross Revenue" of the BPO business. (D.I. 14-1 at ¶ 8) The SPA provides that the parties "shall negotiate in good faith to determine the extent to which [] revenues or income" of post-closing acquisitions would be included the calculation of Gross Revenue. (*Id.* at 54) As a default, such revenue and income are not included in the calculation; the SPA specifically provides that the calculation excludes revenue from post-closing acquisitions "until such time as the parties reach a mutual agreement" about whether to include it. (*Id.*)

Plaintiffs allege that TriZetto breached the SPA by "failing to include the income or revenue of Post-Closing acquisitions in the Earn-Out calculation." (D.I. 1 at ¶ 42) However, they do not allege that the parties reached a mutual agreement that required them to include in the calculation some specific revenues that are missing. For this reason, Plaintiffs' allegations, even

7

if true, provide no basis for concluding that TriZetto breached a duty to include the revenue of

post-closing acquisitions in the earn-out payment calculation under the SPA.

### 3.    Failing to engage in good-faith negotiations or provide reasonable details about earn-out calculation

Plaintiffs allege that TriZetto failed to "engage in discussions, let alone good faith

negotiations, about which Post-Closing Acquisitions should be included in the calculation of

Gross Revenue" and failed to provide "reasonable information or details concerning the Earn-

Out Calculation." (D.I. 1 at ¶ 42)  The record before the Court includes dozens of pages of

correspondence, spanning 10 months, which demonstrate that the parties engaged in discussions

regarding the earn-out calculation. (*See* D.I. 14-2, 14-3, 14-4, and 14-5; D.I. 17 at 3-7)  Plaintiffs

have not alleged facts to support an inference that these discussions – which undisputedly did

occur – did not constitute good faith negotiations.  To the extent that Plaintiffs' allegations rely

on TriZetto's failure to provide "reasonable details" about the earn-out calculation, Plaintiffs

have also failed to allege facts that show why withholding these details amounted to a failure of

good faith.  Because the SPA does not require TriZetto to make specific disclosures with its earn-

out calculation, the Plaintiffs' allegations provide no basis upon which to reasonably infer that

TriZetto breached the SPA by failing to engage in good faith negotiations regarding or to provide

reasonable detail about its earn-out calculation.

### 4.    Failing to appoint or retain an accounting firm

Section 1.02(c)(ii)(B) of the SPA provides that, if Plaintiffs and TriZetto disagree about

"the calculation of the Earn-Out Payment," after 30 days of "good faith best efforts" at resolving

any disputes, they would "promptly thereafter appoint a [nationally-recognized] Accounting

Firm" to "review the disputed elements in the calculation . . . [to] make its own calculation

8

thereof." (D.I. 14-1 at 9)  Plaintiffs allege that TriZetto breached the SPA by failing to appoint

such a firm to resolve the parties' dispute about whether revenue from post-closing acquisitions

should have been included in the earn-out calculation.

The parties' dispute, however, is not about "the calculation" of the earn-out payment, but,

rather, about what revenue is properly included within "Gross Revenue."  The contract defines

"Gross Revenue" as "all consolidated revenues and income of the BPO Business," which in turn

is defined as certain "business process outsourcing services business." (D.I 14-1 at 51, 54)

Although the scope of the BPO business affects the calculation of Gross Revenue – which is one

variable in the earn-out calculation (*id*. at 8) – the parties' dispute is centered on the preliminary

question of which business lines fall within the SPA's definition of "BPO Business."

It is undisputed that Section 10.01(a) specifically addresses how conflicts related to such

questions are to be resolved: by good faith negotiation and mutual agreement between the parties.

(*See* Tr. at 17, 24-25)  Section 1.02(c)(ii)(B), a much more general provision, does not apply to

disputes about the classification of post-closing acquisition revenues.  *See generally DCV*

*Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) (stating where particular issue is

addressed in both general and specific contract provisions, "courts ordinarily qualify the meaning

of the general provision according to the meaning of the more specific provision").

Thus, Plaintiffs have not plausibly alleged a breach of the SPA with their allegations that

TriZetto failed to appoint or retain an accounting firm.

### 5.  Failing to maintain and promote BPO Business

Plaintiffs allege that TriZetto breached the SPA by failing to "maintain operations" and

"promote the sale" of the BPO business. (D.I. 1 at ¶ 43)  Delaware courts have held that the

buyer of a business is not generally obligated to operate the business in a manner that maximizes the chances the seller will receive an earn-out payment. *See Winshall*, 55 A.3d at 639 (finding "implied covenant of good faith" extends to obligation not to ***harm*** a business in order to avoid earn-out payments, but does not impose affirmative duty to maximize likelihood of paying them). The SPA does not impose such a duty either. Rather, the SPA states that TriZetto had "sole discretion with regard to all matters relating to the operation of [the acquired business]." (D.I. 14-1 at 9)

Thus, all of Plaintiffs' allegations fail to state a claim for breach of contract on which relief may be granted. Accordingly, the Court will grant Defendants' motion to dismiss the breach of contract claim.

### B.     Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs allege that each of the actions described above constitutes breach of the implied covenant of good faith and fair dealing inherent in the SPA. Delaware courts consider such implied covenant claims when addressing situations not anticipated by the language of the contract. *See Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010). An implied covenant of good faith cannot be used to "circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal documents." *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotation marks and citations omitted). For this reason, a breach of implied covenant claim generally cannot be based on conduct directly addressed in a contract, unless "the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Nemec*, 991 A.2d at 1126. Thus, "[t]o state a claim for breach of the

10

implied covenant, a litigant must allege a specific obligation implied in the contract, a breach of that obligation, and resulting damages." *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015) (internal quotation marks omitted).

As discussed above, Plaintiffs' allegations relate to conduct governed by the express terms of the SPA. Plaintiffs have not alleged facts demonstrating that the parties' conflict falls into a "gap" in the contract. Because the Court may not second-guess the parties' bargain, Plaintiffs' failure to identify such a gap in the SPA's terms undermines their implied covenant claims. *See Nemec*, 991 A.2d at 1126 ("Parties have a right to enter into good and bad contracts, the law enforces both.").

Accordingly, the Court will grant Defendants' motion to dismiss the breach of the implied covenant claim.

### C.    Declaratory Judgment

Plaintiffs seek a declaratory judgment regarding "what sources of revenue or income are to be included in the term, 'Gross Revenue', as that term is used in the SPA," along with an order compelling the parties to engage the accounting firm Grant Thornton "with respect to the Earn-Out Calculation in accordance with the SPA." (D.I. 1 at ¶¶ 35-36) Federal courts have declaratory judgment jurisdiction only when there is an "actual case or controversy" between parties. *See Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 138 (2007). The Supreme Court has explained that "the operation of the Declaratory Judgment Act is procedural only," meaning that the case or controversy requirement is satisfied only if an actual case or controversy exists "in the constitutional sense." *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240 (1937). "Basically, the question in each case is whether the facts alleged, under all the circumstances,

11

show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (internal quotation marks omitted).   When all of the conditions for a declaratory judgment have been satisfied, it remains within the Court's discretion whether to exercise jurisdiction and grant the requested relief. *See id.* at 136.

Plaintiffs have failed to demonstrate that the parties' disagreement about which post-closing acquisitions contributed to Gross Revenue amounts to a "case or controversy" in the constitutional sense.   The parties agree that the SPA requires that any such disputes be decided by mutual agreement, through good faith negotiation.   As discussed above, Plaintiffs have not alleged facts suggesting that their ongoing disagreement amounts to a failure of good faith negotiation, or that such negotiations are otherwise impossible.   Plaintiffs' allegations fail to demonstrate a substantial controversy of sufficient "immediacy and reality" to warrant declaratory judgment.

Accordingly, the Court will grant Defendants' motion to dismiss the declaratory judgment claim.

## V.   CONCLUSION

The Court finds that Plaintiffs have failed to state a claim upon which relief can be granted.   Therefore, all of their claims must be dismissed pursuant to F.R.C.P. 12(b)(6).

However, Plaintiffs will be granted leave to file an amended complaint, as they have requested to do so and the Court is not persuaded that such an amendment would necessarily be futile. (*See* D.I. 17 at 20; Tr. at 20-21, 41-42, 44, 50, 53)   An appropriate Order follows.